Yvette JONES, Personal Representative of the Estate of Raymond E. Jones, Deceased, Plaintiff,

v.

George PRAMSTALLER, Nancy Martin, Honorable Paul L. Maloney Kathleen Salazar, Michael Wilkinson, Tamerla Hamilton, Renee A. Vanhouten, David Vanarsdale, Sherri Castenholtz, and Badawi Abdellatif, Defendants.

No. 1:09–cv–392.

United States District Court, W.D. Michigan, Southern Division.

May 4, 2012.

Kenneth D. Finegood, Kenneth D. Finegood PLC, Southfield, MI, for Plaintiff.

Kevin R. Himebaugh, James T. Farrell, MI Dept. Attorney General (Corrections), Lansing, MI, Randall Alan Juip, Anthony D. Pignotti, Brian J. Richtarcik, Mark Gregory Reynolds, The Juip Richtarcik Law Firm, Detroit, MI, for Defendants.

*OPINION AND ORDER GRANTING DEFENDANT BADAWI ABDELLA-TIF'S MOTION FOR ORDER DIS-QUALIFYING PLAINTIFF'S EX-PERT WITNESS*

PAUL L. MALONEY, Chief Judge.

Before the court is Defendant Badawi Abdellatif's motion to disqualify Plaintiff's expert, Dr. Jerry Walden, under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and Rule 702 of the Federal Rules of Evidence. (ECF No. 176.) Defendant argues that Dr. Walden is not qualified as an expert and that his opinion regarding the proximate cause of Mr. Jones's death is neither relevant nor reliable. While the court finds that Dr. Walden's long medical career qualifies him to opine on the proximate cause of Mr. Jones's death, and that such an opinion would be both relevant and helpful to the jury, it must nonetheless bar Dr. Walden's testimony. The record shows that Dr. Walden's opinion is based on nothing more than the mere assumption that Mr. Jones likely would have survived had he received hospital care sooner. Dr. Walden presents no basis for such an assumption, neither in the medical literature nor in his personal experience. Because Plaintiff has not shown that this opinion is based on "reliable principles and methods" that have been "reliably applied . . . to the facts of the case," Dr. Walden's testimony must be excluded. Fed.R.Evid. 702.

## I. BACKGROUND [1]

### 1. Factual Background

On September 26, 2007, Raymond E. Jones died of viral meningoencephalitis. Mr. Jones, a prisoner at the Ernest Brooks Facility, under the control of the Michigan Department of Corrections ("MDOC"), had first begun complaining of a strange dizziness 28 days earlier, on August 29, 2007. This suit concerns the treatment and care that Mr. Jones received during those four weeks, alleging that defendants' actions make them liable under 42 U.S.C. § 1983, the Michigan Wrongful Death Act, and the tort doctrines of gross negligence and intentional infliction of emotional distress.

No one corporation or governmental department is entirely responsible for providing health care to Michigan prisoners. Instead, several different entities provide services at various points in the process. The MDOC itself employs Registered Nurses ("RNs") who provide direct care for prisoners, but it has contracted out part of its health-care duties to Defendant Correctional Medical Services ("CMS"). CMS employs doctors, either as employees or as independent contractors, to care for prisoners directly. Both CMS and the MDOC also rely on outside hospitals to provide care, presumably that which they are unable or ill-suited to provide. This case is at least partly about the precise responsibilities and actions of each of these entities, and the roles that each played in Mr. Jones's death.

Raymond Jones first complained of dizziness on August 29, 2007. He told prison staff that he was getting dizzy when he

---

**1.** These facts are taken from this court's disposition of Defendants' summary-judgment motions, having been read in the light most favorable to Plaintiff.

closed or rubbed his eyes, turned his head, or stood up. (Medical Record, ECF No. 154, Ex. 1 at 1–2.) He was evaluated by MDOC-employed registered nurses over the next several days, but his problems continued. Mr. Jones's symptoms soon worsened, and he began reporting ear pain, eye sensitivity, nausea, and an inability to walk. (*Id.* at 3–11.)

Mr. Jones continued to bring his complaints to the prison medical staff over the next 13 days, while his symptoms continued to trouble him. He informed nurses that, among other things, he couldn't see out of one eye because of the dizziness, he had been throwing up for at least two days, and he had a pain in his right ear that he rated a five out of ten. (*Id.* at 12.) On September 8, he was taken to Health Services in a wheelchair, showing a high temperature and high blood pressure. (*Id.* at 13–14.)

During this time, other inmates began to get concerned about Mr. Jones's health. One man, Troy Reinstra, contacted his mother about Mr. Jones's health problems and asked her if she would get in contact with Doug Tjapkes, a prisoner advocate with Humanity for Prisoners, about getting Mr. Jones some medical care. (*See* Reinstra Dep., ECF. No. 154, App'x, at 12–17; Reinstra Aff., ECF No. 154, Ex. 10.) Mr. Jones's bunkmate, Jesse Hawkins, and Kenneth Mazurek, another inmate at the facility, also signed affidavits testifying to Mr. Jones's deteriorating condition. (*See* Hawkins Aff., Mazurek Aff., ECF No. 154, Ex. 10.)

Despite these symptoms, Mr. Jones was not seen by a doctor until September 11, almost two weeks after he first complained of dizziness. Dr. Abdellatif, who was employed by CMS, examined Mr. Jones and assessed him as having "[u]nexplained headaches[,] double vision[,] and dizziness with loss of balance," as well as high blood pressure. (Medical Record, ECF No. 154,

at 19.) Dr. Abdellatif noted the need to rule out "brain pathology," and he ordered Mr. Jones sent to the emergency room for further evaluation. (*Id.*) Dr. Abdellatif testified at deposition that he did not call the hospital to advise them regarding Mr. Jones's status or symptoms. (Abdellatif Dep., ECF No. 154, App'x, at 67–68.) Nor do the records show that Mr. Jones's medical records were sent with him to the emergency room. (*See* Buchanan Dep., ECF No. 154, App'x, at 57.)

Mr. Jones's symptoms remained when he returned from the hospital later that day. (Medical Record, ECF No. 154, Ex. 1 at 22.) When Dr. Abdellatif saw him again the next day, Mr. Jones again showed high blood pressure, as well as a 5-pound weight loss in the last 24 hours. (*Id.*) Mr. Jones told Dr. Abdellatif that he had a CT scan at the hospital and that the results were normal, but Dr. Abdellatif did not contact the hospital to obtain the actual test results. (*Id.* at 25; Abdellatif Dep., ECF No. 154, App'x, at 78–79.) After this examination, Dr. Abdellatif ordered Mr. Jones returned to the emergency room. (Medical Record, ECF No. 154, Ex. 1, at 24–25.) While Dr. Abdellatif testifies that he talked to the emergency room this time about Mr. Jones's situation, there is a discrepancy between the prison's medical records, which state that he did talk to the emergency room, and the version of the records provided to the emergency room, which does not contain any such notation. (*Compare id.* at 25–26; *with* Hospital Record, ECF No. 154, Ex. 8.) Further, the emergency room doctor does not recall any conversation with Dr. Abdellatif, or indeed, any other prison physician, about admitting a prisoner to the hospital. (Evans Dep., ECF No. 154, App'x, at 47–54.) Nor do the hospital records include any information regarding such a call, as would be required by hospital policy. (*See id.* at 48.)

Again, Mr. Jones was sent to the emergency room, and again, he was returned that day. (Medical Record, ECF No. 154, Ex. 1, at 26–28.) Dr. Abdellatif did not see Mr. Jones when he returned. Instead, an MDOC nurse examined Mr. Jones, who stated that he was "scared." (*Id.* at 31.) Mr. Jones told the nurse that the right side of his face was numb and that he felt like he was floating. His right eye was "asymmetrical and wandering," and Mr. Jones was unable to swallow his own saliva. (*Id.*) The nurse consulted with another prison's hospital and was ordered to send him to the emergency room for a third time. (*Id.*)

This time, Mr. Jones went to a different ER. He was again returned to the prison shortly thereafter. Dr. Abdellatif evaluated Mr. Jones the next day, September 13. Mr. Jones was still exhibiting symptoms, and his blood pressure was now up to 173/119. He was "unsteady on [his] feet" and claimed that he couldn't swallow and "need[ed] water bad." (*Id.* at 37.) Dr. Abdellatif prescribed some medicines and ordered that Mr. Jones be given a bottom bunk and a liquid diet. (*Id.* at 34–35.)

The next day, September 14, Dr. Abdellatif contacted the hospital and arranged for Mr. Jones to be admitted. (*Id.* at 40–41.) At the hospital, Mr. Jones was diagnosed with viral meningoencephalitis, an inflammation of the brain and meninges, the membranes covering the central nervous system. He remained at the hospital until September 26, when he died.

### 2. Procedural History

Plaintiff Yvette Jones ("Plaintiff") filed the present suit as personal representative of Mr. Jones's estate, naming as defendants Correctional Medical Services ("CMS"), which has contracted to provide health care to MDOC prisoners; Craig Hutchinson, regional medical director of CMS; Badawi Abdellatif, M.D., a doctor who provided Mr. Jones with medical care under contract with CMS; and a number of MDOC employees. Based on Defendants' respective roles in Mr. Jones's death, Plaintiff claimed damages under 42 U.S.C. § 1983, the Michigan Wrongful Death Act, and the tort doctrines of gross negligence and intentional infliction of emotional distress.

On Defendants' motions for summary judgment, this court dismissed Plaintiff's claims against CMS and Hutchinson. (ECF No. 192.) The court also dismissed Plaintiff's gross-negligence claim against Dr. Abdellatif, but allowed her Section-1983 claim to proceed against him. (*Id.*)

While these motions were pending, Dr. Abdellatif filed the present motion asking this court to disqualify Plaintiff's expert, Dr. Jerry Walden, under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and Fed.R.Evid. 702. After briefing on this motion concluded, the court held a *Daubert* hearing on April 20, 2012.

### II. ANALYSIS

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.* and *Kumho Tire Co., Ltd. v. Carmichael,* the Supreme Court firmly established the district court's role as gatekeeper of expert testimony. *Daubert,* 509 U.S. 579, 589, 113 S.Ct. 2786 (1993); *Kumho Tire,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The Rules of Evidence, according to the Court, "assign the trial judge the task of insuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786. Federal Rule of Evidence 702 codifies this standard, setting out several hurdles for a party seeking to admit expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training,

or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702. Under this rule, the proposed expert must be "qualified ... by knowledge, skill, experience, training, or education." *Id.* The expert's proffered testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." *Id.* Finally, the testimony must be triply reliable: it must be based on (1) reliable principles and methods that are (2) reliably applied to (3) reliable facts and data. *Id.*

The district courts have broad discretion in admitting or rejecting expert testimony. *Morales v. American Honda Motor Co.,* 151 F.3d 500, 514 (6th Cir. 1998). Their decisions, however, "must be made upon the evidence of the witness's qualifications, or lack thereof, and not upon the trial court's personal views." *Kingsley Associates, Inc. v. Del–Met, Inc.,* 918 F.2d 1277, 1286 (6th Cir.1990) (citations omitted). The party offering expert testimony bears the burden of establishing the foundational elements of admissibility by a preponderance of proof. *Nelson v. Tennessee Gas Pipeline Co.,* 243 F.3d 244, 251 (6th Cir.2001) (citing *Daubert,* 509 U.S. at 592 n. 10, 113 S.Ct. 2786). Nevertheless, Rule 702's requirements are applied liberally, leaving "[v]igorous cross-examination, presentation of contrary evidence,

and careful instruction on the burden of proof [as] the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786; *see Pride v. BIC Corp.,* 218 F.3d 566, 577 (6th Cir.2000).

Here, Plaintiff seeks to introduce Dr. Jerry Walden's testimony on the issue of proximate cause: that is, whether it is more probable than not that a Defendant's actions harmed Mr. Jones.[2] Defendant Abdellatif argues that this court should exclude Dr. Walden's testimony because it is irrelevant, because he is not qualified as an expert, and because his opinions are not based on reliable data and methods. After reviewing Dr. Walden's statements regarding this issue, the court will address each of Defendant's arguments in turn.

### 1. Dr. Walden's Opinions

Dr. Walden has made a number of statements regarding the issue of proximate cause. In his expert report, he opined that "a series of encounters with health care that were unfortunate and failed to timely intervene in [Mr. Jones's] serious illness [led] to his untimely death." (Walden Report, ECF No. 176–6, at 2.) Dr. Walden's report criticizes numerous aspects of Mr. Jones's care, not only individuals' actions but also the systemic problems that allegedly delayed diagnosis and treatment of Mr. Jones's illness. Dr. Abdellatif, for instance, repeatedly failed to give ER doctors the information necessary to treat Mr. Jones adequately; he failed to follow up on tests and lab work, he failed to call in supervisors when appropriate, and in general he failed to provide adequate treatment for the symptoms that he did recognize. (*See id.* at 12–13.) Dr. Walden further claimed that Mr. Jones's symptoms "should have caused Jones to have received early physician evaluation

---

2. Plaintiff has not argued that Dr. Walden's testimony is admissible on any other ground.

and led to earlier hospital care when he was likely to survive." (*Id.* at 16.) "Any layperson should have made the connection earlier that Jones needed help," Dr. Walden opined. (*Id.* at 9.) "These factors were apparent to even a lay person." (*Id.* at 16.) The expert report concludes that these deficiencies contributed to Mr. Jones's death:

> The grossly inadequate care of both the nurses and the medical providers[,] including his physician[,] including the unreasonable delays in his care[ ] both failed the standards of care and constituted deliberate indifference to serious medical need and unusual punishment. People usually do not die of viral meningoencephalitis. Jones struggled and died as his delays in care overwhelmed him.

(*Id.* at 16.)

In his deposition, Dr. Walden repeated many of these claims. He criticized Dr. Abdellatif's actions in detail (*see* Walden Dep., ECF No. 176–4, at 96:18–113:19) and opined "that Doctor Abdellatif violated the standard of care for internal medicine and caused harm to [Mr. Jones]." (*Id.* at 81:12–14; *see also id.* at 95:22–96:6.) Dr. Walden also discussed Mr. Jones's disease in more detail, claiming that viral meningeal encephalitis has a low mortality rate and is curable, though treatment other than supportive care would depend on the type of virus involved:

> Q. ... [I]s viral meningeal encephalitis curable?
> A. Yes, it is.
> Q. What's the treatment for it?
> A. Supportive care.
> Q. Supportive care, that's how you treat it?
> A. Right.
> Q. But supportive care will not cure the infection, will it?
> A. No.
> Q. Is there a cure for—is there a treatment for the infection?
> A. Is there a treatment for the infection? Only for certain viruses that are—for instance, herpes has a treatment, there's anti-virals for that. In some of the other viruses anti-virals might be tried but most of the time supportive care is sufficient and people recover.
> Q. What's the mortality rate for viral meningeal encephalitis?
> A. I don't know. Low, but I'm not sure.
> Q. You say low mortality rate?
> A. Yes.
> Q. Below 50 percent?
> A. Oh, yes.
> Q. Below 25 percent?
> A. Yes.

(*Id.* at 26:25–27:25.) Later, Dr. Walden testified that "the treatment for this man was early identification and hospitalization support." (*Id.* at 154:17–20.) Dr. Walden concluded that "this man died when he well likely would have lived had he had people following through and paying attention and taking care of him." (*Id.* at 120:22–121:16.) Plaintiff's brief in response included an affidavit in which Dr. Walden repeats this opinion: "[T]he unreasonable delay of Dr. Abdellatif ... was more probable than not a cause of Raymond Jones'[s] death due to viral meningoencephalitis." (Walden Aff., ECF No. 185–4, at 3.)

### 2. Relevance

■ We start with the question of relevance. To be relevant, an expert's proffered testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. Here, the fact in issue is proximate cause. As this court has discussed in denying Defendant's Motion for Reconsideration, proximate cause is not required "where

the individual had a serious need for medical care that was so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Cooper v. County of Washtenaw,* 222 Fed.Appx. 459, 471 (6th Cir.2007). But though Plaintiff demonstrated a material dispute of fact on this point, it remains to be seen whether or not her evidence at trial will be enough to take away any need to show proximate cause. Until that question is determined, this issue is one on which expert testimony could assist the jury.

Defendant nonetheless argues that Dr. Walden's proffered testimony is not relevant to this case, for three reasons. First, Defendant argues that Dr. Walden's opinions are largely based on common sense— the idea that "[e]verybody—the world over thinks it's better to be treated early rather than late" (Walden Dep., ECF No. 176–4, at 155:16–18)—rather than on any expertise. As such, they are not helpful to the jury, as the opinions provide nothing that they do not already possess.

■ This argument is well taken, at least in principle. It is well established that an expert witness's testimony is not helpful "where the jury has no need for an opinion because it easily can be derived from common sense, common experience, the jury's own perceptions, or simple logic." Charles Alan Wright et al., 29 *Federal Practice & Procedure Evidence* § 6264. To the extent that Dr. Walden's arguments are based on common sense rather than his own expertise and experience, they will not be helpful to the jury. Defendant has failed to show that the basis for Dr. Walden's opinions is so limited, however. The deposition testimony Defendant points to here, when read in context, expressly refers to Dr. Walden's experience as well as common sense:

> THE WITNESS: ... I think that this man ... would have done much better if he had been in the hospital early.

Q. That's speculative too, just like the lawyer just objected to, that's quite speculative, isn't it?

A. Well, it's my opinion. No, I mean, it's—

Q. It's your opinion but it's speculative?

A. Well, I think *it's based on a lot of experience.* Everybody—the world over thinks it's better to be treated early rather than late.

(Walden Dep., ECF No. 176–4, at 155:4–18 (emphasis added).) Further, on Defendant's questioning at the *Daubert* hearing, Dr. Walden reiterated his medical experience and pointed to several pieces of medical literature purporting to support his claims. In general, Dr. Walden's other statements at least claim to be based on his experience and on various medical information sources, which is enough to pass this hurdle—though the basis for Dr. Walden's opinions will be scrutinized more closely below, in discussing the issue of reliability.

■ Defendant next argues that Dr. Walden improperly opines on a legal issue, specifically the ultimate issue of whether Dr. Abdellatif was "deliberately indifferent" to Mr. Jones's well being. The principle that an expert may not make legal conclusions is indeed well established. *See Berry v. City of Detroit,* 25 F.3d 1342, 1353 (6th Cir.1994). Defendant is also correct that Dr. Walden directly opines on a legal issue when he concludes that Dr. Abdellatif's actions constituted deliberate indifference. *See id.* (holding that expert "may not testify ... that [defendant's policies] indicated that the City was *deliberately indifferent* to the welfare of its citizens"). *But see Heflin v. Stewart Cnty.,* 958 F.2d 709, 715–16 (6th Cir.1992) (holding that district court's allowance of expert opinion concluding that defendants were deliber-

ately indifferent was not clearly erroneous). This conclusion, however, was a small part of Dr. Walden's opinion, and in any case, it is not at issue here, as Plaintiff has only sought to defend Dr. Walden's opinion regarding proximate cause·itself. Even if this statement improperly opines on a legal issue, it does not poison the remainder of his testimony, most of which appears to properly avoid legal conclusions.

Finally, Defendant argues that Dr. Walden's opinions are too speculative. For instance, Defendant argues, Dr. Walden does not know what type of virus Mr. Jones had, and he could prescribe no treatment but time for Mr. Jones's illness. Without more definite premises, Defendant argues, these opinions are simply not helpful.

This claim stands on shaky ground. First, Defendant takes an overly uncharitable reading of Dr. Walden's position. Dr. Walden knew from his reading of the medical record that the virus at issue was not herpes simplex. According to Dr. Walden's testimony, herpes is the only meningoencephalitis-causing virus for which a specific treatment exists. Therefore, it should make no difference whether the specific virus at issue is identified or not, because all remaining possibilities would be treated identically. As for treatment, Dr. Walden's argument is clearly premised on the fact that a person under the direct care of a hospital staff will be more able to fight off a virus and heal over time than a person not under that care. Dr. Walden further noted, both in the record and in this court, that Mr. Jones suffered from dehydration and other health issues that could have been addressed in a hospital. Reading this testimony as prescribing nothing but time is unreasonable.

Defendant fails to show that knowledge of the type of virus Mr. Jones had was necessary to give an opinion on the relevant medical care. Indeed, Defendant's own expert gave an opinion on this issue without knowing the type of virus. In short, this line of argument is not persuasive.

Contrary to Defendant's contentions, it is clear that proximate cause may be an issue in this case and that Dr. Walden can offer opinions relevant to whether Defendants' actions were the proximate cause of any harm to Mr. Jones. The "relevance" prong of *Daubert* will not, therefore, prevent him from opining on that issue.

### 3. Qualification

■ Next, we turn to Dr. Walden's qualifications. Dr. Walden has practiced medicine for 42 years, including a period from 1968 to 1969 when he oversaw the health of over 2,500 inmates as the Chief Medical Officer of the U.S. Penitentiary in Terre Haute, Indiana. (Walden C. V., ECF No. 176–3, at 3; Walden Dep., ECF No. 176–4, at 118:8–119:7.) He specializes, and is board certified, in family medicine, but not internal medicine or infectious disease. (Walden Dep., ECF No. 176–4, at 80:13–81:1.) Over the course of his career, Dr. Walden has treated 10–20 patients for meningoencephalitis, though he consulted a specialist in all but a handful of those cases. (*Id.* at 92:1–93:1.) None died, though one patient ended up in a nursing home permanently. (*Id.* at 28:1–13.) Dr. Walden has been retired from day-to-day practice since 2006, though he continues to practice as a volunteer one-half day a week.

Defendant focuses on Dr. Walden's lack of specialization with meningoencephalitis and the fact that he rarely even treated patients with the disease on his own.[3] In

---

3. Defendant also provides a detailed criticism of Dr. Walden's opinions and suggestions for treatment of Mr. Jones. These criticisms go to the substance of Dr. Walden's opinions,

her response, Plaintiff emphasizes Dr. Walden's long career and his direct experience with correctional health care. Plaintiff also cites the Eighth Circuit case of *Robinson v. GEICO*, 447 F.3d 1096 (8th Cir.2006), which affirmed a district court's decision to allow a medical expert to testify outside of his specialization regarding the cause of a plaintiff's injury. *Id.* at 1100–01. For his own part, Dr. Walden argued that his family-practice expertise is relevant, despite his lack of certification in internal medicine, because "the standard of care for internal medicine and family practice is similar.... I would say their standards should be our standard or better." (*Id.* at 81:17–23.)

■ Rule 702 states that expertise may be based on "knowledge, skill, experience, training, or education." Fed.R.Evid. 702. An expert need not have all of these qualifications; so long as his particular background gives him expertise relevant to the opinions he offers, the court should find him qualified. *See Berry v. City of Detroit*, 25 F.3d 1342, 1350 (6th Cir.1994); *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 851 (6th Cir.1981) ("[T]he only thing a court should be concerned with in determining the qualifications of an expert is whether the expert's knowledge of the subject matter is such that his opinion will likely assist the trier of fact in arriving at the truth."). The courts read Rule 702 liberally and will qualify experts so long as their expertise is likely to be helpful. *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 516 (6th Cir.1998) (quoting *Davis v. Combustion Eng'g, Inc.*, 742 F.2d 916, 919 (6th Cir.1984)). So long as that standard is met, it is for the opposing party to impugn the expert's credibility before the jury. *Id.*

Though Dr. Walden has had a long career in family practice, as well as direct experience with correctional health care in particular, he has no special training regarding meningoencephalitis. He has, however, treated a number of cases of meningoencephalitis over the course of his career, and his general medical experience is at least reasonably relevant to the issue of causation. The bar for qualification is a relatively low one, and "[m]ost courts conclude that general knowledge can be sufficient ... to qualify the witness as an expert" in a specific aspect of that subject. Charles Alan Wright et al., 29 *Federal Practice & Procedure Evidence* § 6265. For instance, "a physician who is a general practitioner usually may testify as to medical problems that a specialist might treat in a clinical setting." *Id.* (citing cases). Dr. Walden's medical career and experience arguably give him sufficient expertise to opine on the cause of Mr. Jones's death. Though his direct experience with meningoencephalitis may not be as direct and substantial as one would like, his overall background appears to be enough to qualify Dr. Walden on this subject.

## 4. Reliability

■ Finally, Rule 702 requires that expert opinions be "based on sufficient facts or data" and "reliable principles and methods" that have been "reliably applied ... to the facts of the case." Fed.R.Evid. 702(b)—(d). The Supreme Court has declined to set a particular standard for what qualifies as a "reliable" opinion, instead giving the district courts "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho*

---

however, not to his qualification to give those opinions, and so are irrelevant here. *See Daubert*, 509 U.S. at 596, 113 S.Ct. 2786 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

*Tire,* 526 U.S. at 152, 119 S.Ct. 1167. *Daubert* set out a number of factors for courts to consider when determining the reliability of scientific expert testimony, including:

- whether the theory is testable and whether it has been tested;
- whether the theory has been peer-reviewed and published;
- the known or potential rate of error;
- whether there are standards controlling use of the technique; and
- whether the theory or technique is generally accepted in the relevant community.

*Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786. These factors are not set in stone, however; "the test of reliability is 'flexible,'" and the district court's inquiry must be "tied to the facts of [the] particular case." *Kumho Tire,* 526 U.S. at 141, 150, 119 S.Ct. 1167 (quotation marks omitted). The court's goal in this inquiry "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire,* 526 U.S. at 152, 119 S.Ct. 1167. Regardless, the court's focus must remain "on principles and methodology, not on the conclusions that they generate." *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786. The court's role is not to weed out weak conclusions, but to determine whether the testimony is admissible in the first place. *Id.* at 596, 113 S.Ct. 2786. It is up to the factfinder to weigh competing testimony and determine how much credibility each opinion is due. *Id.*

Defendant challenges the reliability of Dr. Walden's proximate-cause opinion on several grounds. He argues first that this opinion is not based on reliable facts and data. The evidence on record, Defendant claims, contains nothing supporting the claim that Mr. Jones would have lived (or lived longer) had Dr. Abdellatif treated him appropriately. Defendant points to Dr. Buchanan, Dr. Evans, and Physician's Assistant Kroening, who had treated Mr. Jones on separate trips to the emergency room, and whose deposition testimony suggested—according to Defendant, at least—that it would have made little difference if Dr. Abdellatif had sent medical information along with Mr. Jones. Even if Dr. Walden could get over this hurdle, Defendant argues, he cannot avoid the fact that there is no known treatment for non-HSV viral meningoencephalitis, and so even with a diagnosis the treating physicians could do nothing for Mr. Jones.

This argument is misplaced. Many of the "facts" that Defendant accuses Dr. Walden of ignoring are in fact still matters of dispute. Plaintiff could present evidence contradicting Defendant's proffered testimony, and certainly, she could argue the common-sense proposition that a patient's medical history may help diagnosis even when a medical professional performs her own examination. Similarly, as discussed above, Dr. Walden's argument is that Mr. Jones would have had a better chance of fighting off the virus in a hospital than in the prison health system. This argument does not require that there be a specific treatment for Mr. Jones's illness, and Defendant's argument to the contrary misses the point. Essentially, Defendant is arguing the merits of Dr. Walden's opinion, not whether it is based on reliable data. These are arguments for the jury, not for a *Daubert* motion. *See Daubert,* 509 U.S. at 596, 113 S.Ct. 2786.

■ Defendant next argues that Dr. Walden applied no reliable methodology in coming to his conclusion that Dr. Abdellatif's actions caused Mr. Jones harm: "Rather, his opinions regarding proximate causation rest upon the generic belief that

the earlier treatment is provided, the better the outcome for the patient." This conclusion, Defendant points out, is contradicted by Dr. Walden's admission that there is no treatment for non-HSV meningoencephalitis and his inability to say for sure whether Mr. Jones would have lived had Dr. Abdellatif treated him properly.

The broad claim here has more merit than the specific disputes, which, again, are substantive disagreements with Dr. Walden's conclusion, not criticisms of the methodology he used to reach them. The heart of this complaint, however, is that Dr. Walden's conclusions are not based on any scientific methodology, but instead a bare assumption that earlier care is better. When pressed on his basis for concluding that deficient treatment was a cause of Mr. Jones's death, Dr. Walden fell back on common sense and his own experience: "Well, I think it's based on a lot of experience. Everybody—the world over thinks it's better to be treated early rather than late." (Walden Dep., ECF No. 176-4, at 155:16–18.)

Until he was brought to the stand at this court's *Daubert* hearing, Dr. Walden nowhere attempted to justify this conclusion more thoroughly. On questioning, however, he was able to produce eight pieces of medical literature—actually, eight citations to pieces of medical literature, as he only provided partial print-outs or abstracts of most of the pieces—in support of his conclusion. These references, to the extent the court can determine their identifying information, are as follows:

(1) Hearing exhibit 1: Walsh, *Palliative Medicine* (1st ed. 2008) (Figure 150–2, "Flow chart for screening assessment, decision making, and management of anorexia-cachexia syndrome (ACS)");

(2) Hearing exhibit 2: Rakel, *Textbook of Family Medicine* (8th ed. 2011) ("Physical Examination");

(3) Hearing exhibit 3: Ferri, *Ferri's Clinical Advisor 2012* (1st ed. 2011) ("Anoxic Brain Injury");

(4) Hearing exhibit 4: M.N. Cocchi, et al., *The Role of Cranial Computed Tomography in the Immediate Post-Cardiac Arrest Period,* 5 Internal & Emergency Med. 533 (2010) (abstract);

(5) Hearing exhibit 5: Stephen D. Hearing, *Refeeding Syndrome,* 328 Brit. Med. J. 908 (2004);

(6) Hearing exhibit 6: M.A. Crook et al., *The Importance of the Refeeding Syndrome,* 17 Nutrition 632 (2001) (abstract);

(7) Hearing exhibit 7: S.J. Miller, *Death Resulting from Overzealous Total Parenteral Nutrition: The Refeeding Syndrome Revisited,* 23 Nutrition in Clinical Prac. 166 (2008) (abstract); and

(8) Pages from the following chapters of *Harrison's Principles of Internal Medicine* (17th edition): Chapter 41 (Carol M. Reife, "Weight Loss"); Chapter 45 (Bradley M. Denker and Barry M. Brenner, "Azotemia and Urinary Abnormalities"); Chapter 72 (Douglas C. Heimburger, "Malnutrition and Nutritional Assessment"); Chapter 76 ("Eating Disorders"; Anorexia Nervosa); Chapter 295 (Marc Ghany and Jay H. Hoofnagle, "Approach to the Patient with Liver Disease"); Chapter 296 ("Evaluation of Liver Function"); and Chapter 376 (Karen L. Roos and Kenneth L. Tyler, "Meningitis, Encephalitis, Brain Abscess, and Empyema" (hearing exhibit 8)).

Initially, there is a significant question as to whether this literature is even relevant to the reliability of Dr. Walden's opinion. As Defendant pointed out at the time, exhibits 1–7 were printed out no more than

three days before the *Daubert* hearing, suggesting that they are a rationalization of, rather than a basis for, Dr. Walden's opinion. Plaintiff failed to contradict this inference, and indeed, the record shows that Dr. Walden cited only one of these sources—Rakel's *Textbook of Family Medicine*—in his expert report, and only one—*Harrison's Principles of Internal Medicine*—when asked in his deposition about the materials he had consulted in preparing his opinions in this case.[4] When questioned about *Harrison's*, Dr. Walden further admitted, "Well, I haven't done much from Harrison actually in this case so I probably could have easily left it at home." (Walden Dep., ECF No. 176–4, at 81:4–6.) And Dr. Walden admitted at this court's *Daubert* hearing that he did not use most of these sources in formulating the opinion presented in his expert report. The court need not now determine whether this literature is properly considered, however, because even if it is treated as legitimate, the literature is insufficient to save Dr. Walden's opinion.

The Sixth Circuit typically applies the *Daubert* factors to determine whether medical causation testimony is reliable. *See, e.g., Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 676–77 (6th Cir.2011) (toxic tort case). None of these factors can even be applied to Dr. Walden's causation testimony, however, because he never gives enough of an explanation for the court to analyze. Dr. Walden's testimony that "most of the time supportive care is sufficient and people recover" (Walden Dep., ECF No. 176–4, at 27:15–16) provides no basis to infer causation; nor does his statement that "[e]verybody—the world over thinks it's better to be treated early rather than late." (*Id.* at 155:16–18.) These claims are based on the assumption that the mortality rate of non-HSV viral meningoencephalitis is lower when timely, sufficient care is provided. Perhaps this is true; perhaps not. But Dr. Walden provides no support for this assumption. The theory is testable, but he does not state the results of any testing or cite to any peer-reviewed studies on the issue. *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786. He cites no statistics regarding these mortality rates, let alone the error on any such figures. *Id.* Indeed, Dr. Walden was unable to estimate the mortality rate for viral meningeal encephalitis more precisely than "[b]elow 25 percent." (Walden Dep., ECF No. 176–4, at 27:17–25.)

Nor does the cited literature help Dr. Walden. Presumably, these sources were meant to show that Dr. Walden's opinion was based on peer-reviewed and published research, generally accepted in the medical community. *See Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786. But Dr. Walden never established a connection between his opinion and this literature. His testimony regarding these documents gave the court no reason to believe that the research had any relation to Dr. Walden's claim that inadequate care was the proximate cause of Mr. Jones's death. When not quoting general statements that earlier treatment is preferred, Dr. Walden focused on mortality rates for patients with meningoencephalitis, significant weight loss, and other problems that Mr. Jones had suffered from.

Even if we assume that people normally don't die from Mr. Jones's illness, a low mortality rate alone does not show causation. Any number of factors could have led to Mr. Jones's death, but Dr. Walden's testimony gives no scientific basis to presume that Dr. Abdellatif's actions actually

---

4. Dr. Walden cited several other sources in his report and deposition, but these appear to be unrelated to the issue of causation, and Plaintiff neither cited nor relied on them in defending Dr. Walden's testimony.

did so. "[A]n expert's testimony need not eliminate all other possible causes of [an] injury." *Jahn v. Equine Services, PSC*, 233 F.3d 382, 390 (6th Cir.2000). But Dr. Walden eliminates none. He did not perform any analysis intended to exclude other potential causes of Mr. Jones's death. *Cf. Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260 (6th Cir.2001) (recognizing differential diagnosis as an "appropriate method for making a determination of causation"). In fact, his report does not even discuss other possibilities. Nor does Dr. Walden discuss how his medical experience leads him to his conclusion. As far as the record shows, Dr. Walden's opinion is based solely on an assumption that because most people who have meningoencephalitis survive, Mr. Jones would have survived as well if he had been admitted to the hospital earlier. This assumption is illogical and insufficient. *See Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir.2010) (holding expert testimony inadmissible where expert "never explained how he made this leap—how *this* case stemmed from manganese exposure"). To suggest probabilistically that deficient care caused a death, one must do more than show that few people die of a disease. One must establish some connection between quality of care and the survival rate. Dr. Walden has provided no evidence on this issue, and examination of the cited sources shows that they do not provide any support for such an inference—or even relate to proximate cause in any substantive way.

■ When confronted with this point, Plaintiff argued, essentially, that the court is not qualified to interpret the academic literature supposedly underlying Dr. Walden's opinion and must instead rely on Dr. Walden's testimony that they support his claims. While it is true that the courts are not to cast judgment on the substance of an expert's testimony, this does not mean that the courts are forbidden from any

evaluation of the materials cited by an expert. Indeed, *Daubert* expressly tasked the district courts with the duty to ensure that an expert's testimony is based on reliable methods. *Daubert*, 509 U.S. at 597, 113 S.Ct. 2786 ("the trial judge [has] the task of insuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."). Under Sixth Circuit precedent, "it is not proper for the Court to exclude expert testimony merely because the factual bases for an expert's opinion are weak." *Andler v. Clear Channel Broadcasting, Inc.*, 670 F.3d 717, 729 (6th Cir.2012) (quoting *Boyar v. Korean Air Lines Co., Ltd.*, 954 F.Supp. 4, 7 (D.D.C.1996) (internal quotation marks omitted)). Here, however, the factual basis for Dr. Walden's opinion is not just weak but nonexistent. Rule 702 requires "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786. Plaintiff has not established that Dr. Walden's opinion is based on anything more substantial. As such, the court simply cannot say that Dr. Walden has "employ[ed] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167. Dr. Walden's testimony therefore must be excluded.

## V. CONCLUSION

Plaintiff, as the party offering Dr. Walden's expert testimony, bears the burden of establishing admissibility here. *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir.2001) (citing *Daubert*, 509 U.S. at 592 n. 10, 113 S.Ct. 2786). The record before the court, however, fails to demonstrate any basis for Dr. Walden's opinion other than his assumption that had Mr. Jones been hospitalized sooner, he likely would have survived. Neither Dr. Walden's personal experience nor the cited medical literature provides support for

such a claim. As such, the court cannot say that Dr. Walden's opinion is based on "reliable principles and methods" that have been "reliably applied … to the facts of the case." Fed.R.Evid. 702. The court will therefore grant Defendant Abdellatif's motion to disqualify expert Jerry Walden, M.D.

### *ORDER*

For the reasons discussed above, Defendant Badawi Abdellatif's motion to disqualify Plaintiff's expert, Dr. Jerry Walden, under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and Rule 702 of the Federal Rules of Evidence (ECF No. 176) is **GRANTED.**

**IT IS SO ORDERED.**